

IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| WAYNE TRAYWICK, | § § § § § § § | |
| *Plaintiff,* | § § § | CIVIL ACTION NO. 2:16-cv-00730-DCN-MGB |
| vs. | § § | |
| MEDICAL UNIVERSITY OF SOUTH CAROLINA, and HOOD LAW FIRM, *Defendants.* | § § § § § § § § | JURY TRIAL DEMANDED |

---

## PLAINTIFF'S FIRST ORIGINAL COMPLAINT

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW**, the Plaintiff, WAYNE TRAYWICK (hereinafter referred to as "Plaintiff"), bring this independent action under FRCP Rule 60(d)(3) and Declaratory Relief for violation of his civil rights under and pursuant to 42 U.S.C. § 1983 (2012), and Fourteenth Amendment the United States Constitution, against MEDICAL UNIVERSITY OF SOUTH CAROLINA, and HOOD LAW FIRM (hereinafter collectively referred to as "Defendants") and show upon this Honorable Court the following, to-wit:

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction of the federal claims under and by virtue of Title 28 of the United States Code, 42 U.S.C. § 1343 and Title 28 if the United States Code, 42 U.S.C. § 1332.

2.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 (a) and because this case involves a matter in controversy that exceeds the sum or value of $75,000.00, inclusive of interest and costs, and is between citizens of different States.

3.     Venue is proper pursuant to 28 U.S.C. § 1391 (b) and in South Carolina because a substantial part of the events and omissions by Defendants giving rise to this claim occurred in South Carolina.

## PARTIES

4.     Plaintiff is a resident of Tarrant County, Texas.

5.     Defendant, **MEDICAL UNIVERSITY OF SOUTH CAROLINA** (hereinafter referred to as "MUSC") is a public university and can be served by serving registered agent Thomas P. Anderson, who may be found at 18 Bee Street, Charleston, SC 29425. **Issuance of citation is requested at this time.**

6.     Defendant, **HOOD LAW FIRM** (hereinafter referred to as "Hood Firm") is a Limited Liability Corporation and provided legal representation to MUSC. Defendant can be served by serving it's registered agent, Robert H. Hood, who may be found at 172 Meeting St, Charleston, SC 29401. **Issuance of citation is requested at this time.**

7.     This action arises under Fed. R. Civ. P. 60(d)(3), the Fourteenth Amendment to the Constitution of the United States and under the Civil Rights Act, Title 42 of the United States Code, 42 U.S.C. § 1983, and under the laws of the State of South Carolina.

## INTRODUCTION & HISTORY

8.      This action before the Court involves misconduct from Hood Law firm along with

M.U.S.C. that resulted in a "fraud upon the court". This action is brought forth pursuant to Fed. R.

Civ. P. 60(d) (3). Rule 60(d) provides for the following relief:

> (d) *Other Powers to Grant Relief. This rule does not limit a court's power to: entertain*
> *an independent action to relieve a party from a judgment, order, or proceeding; grant*
> *relief under* 28 U.S.C. § 1655 (2012) *to a defendant who was not personally notified of*
> *the action; or set aside a judgment for fraud on the court.*

9.      Therefore, this present action is timely under Rule 60(d).

10.     Moreover, additional basis of this complaint arises from the conduct of all the

Defendants, individually and jointly, by (i) committing fraud upon the court; (ii) using undue

influence upon the court to deprive Plaintiff of his constitutional rights; (iii) committing fraud upon

forming an "academic committee" and voting plaintiff out of school for behavior consisting over

free speech, but not for academics (iv) suppressing free speech; (v) dismissing Plaintiff for non-

academic reasons without affording him of his constitutional rights  (vi) failing to honor and adhere

to the honor code after making Plaintiff sign it; (vii) threatening student by giving him Fs in

subjective grading for reporting honor code violation as the honor code made it a violation of not

to report such violations, (viii) allowing students, excluding Plaintiff, to have the actual test exams

that placed them in advantageous positions; (ix) subjecting Plaintiff to a different grading curve

than his peer; and, (x) conspiring to deprive Plaintiff of his constitutional rights, (xi)violating

public policy.

11.    Hood Law Firm an officer of the court, committed fraud upon the court, by knowingly making fraudulent material misrepresentations in behalf of M.U.S.C., to the judge and to the court system.

12.    Hood Law firm, an officer of the court, committed fraud upon the court by using influence to directly corrupt the judge and his ability to rule fairly upon the plaintiff's claims.

13.    Thus Hood Law Firm has committed material fraud upon the court. As a matter of law, fraud upon the court makes all decisions null and void and has no statues of limitations.

14.    Plaintiff's lawsuit was dismissed by Judge Carr who relied upon fabricated documents, fabricated procedures, attorney misconduct, perjury, and overall conspiracy of Defendants to cover up the due process violations against Plaintiff to deny him of his due process rights when he sued the Medical school in federal court.

15.    The Appeals Court did not address the fraudulent acts of MUSC and Hood, the attorney misconduct, or the fraudulent victimization of the District Court; however, the Appeals court affirmed the District Court's judgment, which was all based upon fraud from Defendants. (95-1814, filed September 21, 1995). The Supreme Court denied Plaintiff's Writ. As a result, no Court has evaluated, commented on, or provided an opinion regarding the fraudulent conduct of Defendants, the fraud upon the court, the attorney misconduct and involvement in the scheme to deny plaintiff of his due process rights from the district court and to defraud the District Court of Appeal.

16.    Plaintiff provides clear, physical evidence exposing that during legal proceedings before the District Court – Hood Law Firm and MUSC, engaged in misconduct and in a scheme to defraud the Court. Specifically, Hood Law Firm knowingly submitted to the Court false statements and documentation regarding material evidence; Hood Law Firm knew that their

clients, MUSC, were not truthful to the Court, in their statements regarding material evidence; Hood Law Firm submitted to the Court documents that they knew or should and could have known to have been fabricated; Hood Law Firm intentionally submitted to the Court the statements of Defendants that they knew to be false; and Hood Law Firm cooperated with MUSC to conceal their misconduct from the Court system. Judge Robert Carr relied upon the fraud submitted to him by Hood Law firm and M.U.S.C. to deny plaintiff his due process rights in the federal court system.

17.     The Defendants position that Plaintiff's dismissal from MUSC was for "Academic Reason" all the way up to the Supreme Court, when the evidence and deposition testimony showed the he was not dismissed for academic reasons but for inappropriate behavior  was material to the Court, and was relied upon by Judge Carr in his ruling and Defendants concealed evidence showing that (i) plaintiff was not dismissed for academics,  (ii) plaintiff was dismissed  for certain utterances, violating his right of free speech (iii)  plaintiff was not afforded any due process rights before being dismissed from M.U.S.C.

18.     MUSC fabricated evidence to side step the Academic Policies and Information rules which mandates that Plaintiff receive notice of allegations against him and an opportunity to defend himself/herself against the allegations.

19.     The inappropriate behaviors referred to by MUSC should have been presented in front of the Honor Code Committee, however, they deliberately mislead the Courts and Plaintiff. Instead, M.U.S.C. fraudulently voted him out of school at an academic performance committee initially claiming that it was for academics, manual dexterity, and behavior reasons.   However, Defendants concealed and mislead the Court of the fact that academics and manual dexterity played no role in his dismissal, but was dismissed only for certain utterances, what they considered

to be behavior problems, which they covered up those utterances in plaintiff's dismissal letter as being "characteristics which seem inappropriate one seeking to become a dentist." This behavior by Defendants is also a denial of Plaintiff's right to freedom of speech afforded by the United States Constitution.

20.    Plaintiff was not notified of the allegations against him, he was not formally charged by MUSC, and his first notice was via the letter attached hereto advising him that he has been dismissed from the school.

21.    Had those allegations gone before the Honor Code Committee, Plaintiff would have been entitled to a written notice and a full hearing and a chance to have representation, present evidence, bring witnesses and cross examine witness.

22.    Plaintiff's lawsuit was dismissed by Judge Carr who relied upon fabricated documents, fabricated procedures, attorney misconduct, perjury, and overall conspiracy of Defendants to cover up the due process violations against Plaintiff.

23.    During the proceedings in front of Judge Carr, Defendants mislead the court and concealed clear, physical evidence of due process violations in the way he was dismissed from MUSC, as well as fabricating rules and polices not in existence to conceal their fraudulent acts from the District Court during Plaintiff's lawsuit.

24.    Plaintiff claims that the Court's orders and judgement be consider null and void as to his 1994 Complaint.

25.    Defendant's MUSC and Hood Firm, an officer of the court, improperly influenced the Court and committed fraud upon the court through their misconduct. Plaintiff will show that conclusive evidence that Plaintiff was neither dismissed for academic nor manual dexterity

reasons, and further that the only remaining reason for dismissal was for alleged misconduct under the MUSC Honor Code.

26.     Plaintiff will further present testimony from Dr. Hamrick and Dr. Dechamplain substantiating Plaintiffs claims.

## STATEMENT OF FACTS:

27.     MUSC specializes in training students in the fields of (i) medicine, (ii) dental medicine, (iii) nursing, (iv) health professions, (v) graduate studies, and (vi) pharmacy. In 1993 Plaintiff was a dental student at MUSC.

28.     The dental school was quite small, and only contained roughly fifty students. As a result, everyone got to know each other quite well.

29.     During Plaintiff's first year, which consisted of mainly gross anatomy, Plaintiff discovered that certain students were violating the honor code and were being aided by certain teacher's assistants/professors in violation of the honor code.

30.     Specifically, Plaintiff discovered that a group of his peers were given the actual test questions from the University and had certain teaching assistants helping them to obtain information regarding the yet-to-be administered lab questions.

31.     Plaintiff was disturbed by what he found. Plaintiffs obtained a triple major in undergraduate studies, and was appalled by the complete lack honesty and cheating culture that was so prevalent at such a prestigious institution.

32.      Plaintiff, a father of a young child at the time, took his classes very seriously, he abided by the honor code as if it was sacred. The honor code mandated that a MUSC student must report all violations of the honor code, and failure to do so was an honor code violation itself.

Plaintiff then reported the cheating and honor code violations to the Assistant Dean at the time, Dr. Hamrick.

33.     During the initial meeting, Dr. Hamrick, assistant dean of MUSC, informed all students that he had an open door policy, and welcomed students to inform him of any honor code violations occurring at MUSC. However, that was far from the truth.

34.     Plaintiff's complaint was ignored, moreover, Plaintiff began to receive negative treatment from MUSC. Plaintiff was frustrated and attempted to follow up with Dr. Hamrick.   He had also found out that many students who had flunked gross anatomy with a low f were given a grade close to or better than plaintiff's passing grade.  Than the next semester his peers were graded on a different academic curve, which the school gave plaintiff no curves.

35.     Despite this however, Plaintiff passed his first full time semester consisting of only gross anatomy in summer school and the second semester he finished  with a GPA of 2.87, which would have been much higher if the school had curved his grades as they did the rest of his class mates.

36.     When Plaintiff continued to press Dr. Hamrick and MUSC about unfairness:  1. Some students having the actual text exams while those tests were not being provided to the class as a whole,  2.  The same students being shown the upcoming lab questions , which also was not provided to the class a whole, and 3.  A lot of students were making Fs but the teacher were curving their grades to a higher grade than plaintiff's grade, Dr. Hamrick further stated that this is how MUSC operated and if plaintiff did not keep his mouth shut, he would be given failing grades in all subjective grading classes and be expelled  from MUSC.

37.    Dr. Hamrick and MUSC conspired to demoralize Plaintiff and end his career. They succeeded by first killing Plaintiff's dream of specializing. Plaintiff intended to specialize after dental school, however the residency requirement was very competitive.

38.    Plaintiff was informed that MUSC used a class ranking system in making a determination about residency. Plaintiff could not compete for a residency due to the different treatment and unfairness he was subjected to, so his ambitions of specializing had come to an end, even though his ranking on the dental exam to get into the school he scored in the 80th percentile and he felt he and an opportunity to finish near the top of his class, that is without the cheating and different grading curves.

39.    Plaintiff felt trapped without any choice other than to heed Dr. Hamrick's instructions and keep his mouth shut. Nevertheless, he was unhappy about the way the school operated, but he realized that he would still be a dentist and that life would be good.

40.    As a result, the group of peers involved in the cheating were able to finish the class with top marks with minimal effort and many students who put forth minimal effort in their courses made Fs but after their generous curves from teachers got better grades than Plaintiff's. This too was a violation of MUSC'S policy.

41.    However, Plaintiff, did not talk to other students about this and he was willing to accept his fate not being able to specialize, but to continue on with his dental training.

42.    During the end of the second semester, Plaintiff had a non-subjective class with a subjective lab. It was the only subjective grading class for that semester. The teacher promised him that he would be given a F in his class. Plaintiff had obeyed Dr. Fitzhugh Hamrick and had kept his mouth shut and he knew that he was under the command of Dr. Fitzhugh Hamrick to give

him a F so he could use that to carry out his threat in future years if needed, assuming if he kept his mouth shut or not.

43.     He talked to Dr. Whittaker and asked him would he be the only F and he said yes. Plaintiff informed him that his non subjective grading in his class was an A.  When Plaintiff asked is there anything he could do to pass his class, Dr. Whittaker said no that he was going to give plaintiff an F no matter what.

44.     Plaintiff informed Dr. Whittaker of people making many Fs in non-subjective grading classes and all of them were getting passing grades close to his or better than his after the generous curves and that the school was not flunking anyone and that it would not be fair for him to receive the only F out of his classmates.  He said that was none of Plaintiff's business.

45.     Again the Plaintiff's class was small and the lab class consisted of only one project carving a tooth and root out of a block of wax.  Everyone did their assignment in open class. Plaintiff saw the work of many of his class mates and his work looked better than a lot of them, including the student who sat directly beside him. Plaintiff was convinced that this was a result of Dr. Hamrick's threats and because he discovered the cheating between certain peers and the teachers assistants.

46.     Plaintiff offered alternative methods of independent subjective grading, to ensure his grade was not punitive, but these pleas were denied by Dr. Whittaker and M.U.S.C. Plaintiff asked Dr. Whittaker if he could take some of the wax work from other students along with his wax work and have it independently judged.  Dr Whittaker said no, reinforcing that he was going to give plaintiff an F no matter what.

47.     Plaintiff knew he was being railroaded for complaining to the assistant dean about the cheating and different curves being used.

48.    *See Exhibit "C"*, Dr. Fitzhugh's Hamrick Deposition Page 99, starting with line number 17: "professional conduct for Wayne Traywick dated December the 21st, 1993. Mr. Traywick made an appointment with the dean. He canceled the appointment and went to the president's office and demanded to see him as he was being treated unfairly. The secretary told him he needed to go through the channels." Plaintiff said, I have talked to Dr. Hamrick and he is conspiring with other faculty to dismiss me."

49.    The same day Plaintiff met with Dr. DeChamplain, Dean of MUSC, and informed him of the honor code violations, the cheating, his frustration with Dr. Hamrick of making threats to him when he complained of the honor code violations and of his frustration with some students putting very minimal effort in their classes, making Fs, but getting better grades than his after the generous curves being used for those students. Plaintiff also advised the Dean of other students that were willing to corroborate his allegations.

50.    Dr. DeChamplain assured Plaintiff that he would investigate and informed him that he would not be given a failing grade in his subjective grading class as a result of his concerns/complaints. The Dean assured plaintiff that he will look into the inequities and that everything will turn out to be ok. That was at the end of the semester. The plaintiff left to take his family on a vacation but when he came back he realized that the Dean intentionally lied to him.

51.    The **same day** that Plaintiff met with Dr. DeChamplain, Dr. Hamrick called a meeting and formed an Academic Performance Committee along with various professors, some of which were the subject of Plaintiff's complaints, to discuss Plaintiff's future with the school. *See Exhibit "A"*. Dr Doughety said student has ideas that he feels very strongly about. He said Plaintiff would not take a makeup exam because now some students have a higher grade than he has with the makeup exam. Plaintiff said since the histology grades were curved it was not fair.

Plaintiff was exercising his right to freedom of speech.  Further, MUSC teacher failed to mention that Plaintiff's grade was so high that he did not need to take a make-up exam.

52.    Dr. Millers said student asked him if he could exempt the final exam in biochem or to take it early so that he could take his family to Walt Disney.  Plaintiff admits, however, this question to the MUSC teacher is also freedom of speech.

53.    The last teacher who reported on was Dr. Whittaker, the teacher who promised that he would be given an F in this class and the only F.

54.    He goes on to say there is only one failure, Plaintiff Wayne Traywick.  His exams and quizzes were good, an A average, but his lab work was bad.  He then goes on to say somethings that are not true.  Then he goes on to say that the class president was informed by Plaintiff that he would not be going to the memorial service for the cadavers because of his feeling for gross anatomy.

55.    Then the committee voted him out for academic difficulties, manual dexterity and unprofessional behavior. Further, on the same day, Dean Richard Dechamplain sent Plaintiff out a dismissal letter stating that he had been voted out of school for exhibiting characteristics which seem inappropriate. *See Exhibit "B".*

56.    Throughout the entire process described in paragraphs 51-55 above, Plaintiff was deprived of his due process and not allowed to respond to the fabricated allegations against him or participate in the process whatsoever.

57.    Even though the Plaintiff had an idea of what MUSC considered to be characteristics which seem inappropriate for one seeking to become a dentist, he was left to only assume what they could be, so he took the deposition of the Dean.  The Dean stated that he was dismissed for reporting his peers for cheating and complaining of unfair treatment.   He took the

deposition of Dr. Frtizhugh Hamrick, who formed the committee, and he stated that he was not dismissed for academics or manual dexterity but for behavior.

58.    Plaintiff was dismissed from MUSC without ever being given a specific or definite charge, violating his Due Process Rights.

59.    Plaintiff was never given notice of a hearing before his dismissal, violating his Due Process Rights. In his deposition, Dr. Hamrick responded in the negative when asked if Plaintiff was given notification in writing of any formal charges.

60.    Plaintiff was never given an opportunity to examine the evidence used in making the determination against him, violating his Due Process Rights.

61.    Plaintiff was never given an opportunity to face his accusers, violating his Due Process Rights.

62.    Plaintiff was only made aware of the case against him after it had been decided and was not afforded adequate time to defend against the fabricated charges, violating his Due Process Rights.

63.    Plaintiff, as a student with both liberty and property interests at MUSC, had the right to a Due Process hearing prior to his dismissal, but was never afforded one.

64.    Plaintiff was never given an Honor Code violation for inappropriate behavior nor was he given the University's Due Process hearing prior to dismissal.

65.    Plaintiff was told he was not dismissed for any Honor Code violation, which states that a student accused of misconduct is entitled to written notice and a full hearing not less than seven days prior to the hearing date, a short and plain statement of the charges and supporting facts, the time and place of the hearing, a statement of the rights of the parties to bring witnesses to present evidence, and to have representation.

66.    MUSC states that Plaintiff was not dismissed for misconduct, but for inappropriate behavior.

67.    MUSC split hairs to cover up the numerous Due Process violations, as misconduct is defined as inappropriate behavior.

68.    In 1994, Plaintiff, acting pro se, filed a lawsuit against MUSC for violation of his due process rights and freedom of speech.    Plaintiff also sought injunctive relief.    Judge Carr was presiding over the injunction hearing.

69.    At the hearing, Plaintiff tried to read the deposition testimony of Dr. Hamrick and Dr. Dechamplian, where they admitted that he was not dismissed for academic reasons or manual dexterity but for certain utterances and that he was not provided any type of due process of law. Judge Carr was at that time receptive and appeared to indicate to Plaintiff that MUSC did violate his Due Process rights by dismissing him for academic reasons in the manner that they did. At that moment, an attorney from the Hood Firm interrupted the exchange, ran outside the courtroom and ran back in with Dr. Hamrick the Assistant Dean of the Dental School.

70.    Upon Dr. Hamrick's entering into the courtroom, the Defendants mislead the Court wherein Judge Carr denied Plaintiff's injunctive relief.    Judge Robert Carr changed his mind as a result of Defendants fraud, concealment, and mischaracterization of the evidence.

71.    In that deposition, Dr. Hamrick admits that Plaintiff was not dismissed for academic reasons but for exhibiting inappropriate behavior. Dr. Hamrick stated in his deposition "you were not dismissed for academic reasons, you know." *See Exhibit "C".*

72.    In that deposition, Dr. Hamrick admits that Plaintiff was not formally charged with anything until he received his dismissal letter from the Dean, and that this letter was the first notice of the dismissal proceeding plaintiff received.

73. Moreover, the depositions of Hamrick and DeChamplain confirm that a) Plaintiff was not formally charged with any offense, including misconduct of any sort, prior to receiving the dismissal letter; b) Plaintiff was punished for voicing concerns of professor misconduct to MUSC supervisors; and c) Plaintiff was not afforded the Due Process Procedure for dismissal for students who exhibit behavior which is inappropriate and causes Honor Code Violations. *See Exhibits "C" and "D".*

74. Despite the deposition testimony of Richard DeChamplain stating that Plaintiff was not dismissed for academic reasons, Plaintiff's claims were dismissed by Judge Carr after Hood Law Firm and MUSC interrupted the hearing and concealed this evidence from the Court. Plaintiff appealed and the Dismissal was upheld.

75. Plaintiff filed a Writ of Certiorari to the Supreme Court of the United States. Defendant Hood Firm filed in MUSC's response that Plaintiff was dismissed from Dental School for academic reasons, contradicting the prior testimony of Hamrick and DeChamplain. Plaintiff's Writ was denied.

76. The District Court was improperly influenced by the Defendants and fraud upon the court is present as a result of (i) the fraud/misrepresentation that Plaintiff's dismissal from MUSC was for "Academic Reason" all the way up to the Supreme Court, when the evidence and deposition testimony showed the he was not dismissed for academic reasons but for alleged inappropriate behavior; and (ii) Dr. Hamricks' and Hoods presence and act/omissions in the courtroom during the Injunction Hearing influenced Judge Carr.

77. Furthermore, this is not the first time that M.U.S.C. voted students out of school for non-academic reasons by denying them their constitutional rights but it is MUSC's protocol,

history and practice when dismissing students to form a committee and to vote them out of school for having characteristics which seem inappropriate. *See Exhibit "B".*

78.    After receiving the dismissal letter from M.U.S.C., Plaintiff took the deposition of the assistant dean, Dr. Frithzhugh Hamrick.  Which yielded the following testimony attached hereto as *Exhibit "C":*

> **On page 26, line item 17, he states, "you were not dismissed for academic reasons, you know."**
>
> **On page 59, line item 21, he states,  "you were dismissed because for the behavior, but not because of the academics or manual dexterity."**
>
> **On page 133, line item 10, Just read the letter.  The letter says exactly why.  You were dismissed for inappropriate behavior, unacceptable of someone planning on becoming a dentist."**
>
> **On page 135, line item 3, he stated, "You were dismissed because of inappropriate behavior."**

79.    Then Dr. Frtizhugh Hamrick, was asked on page 34 line item 8, "Did I get any of those due process rights as required by M.U.S.C.'s policies?  He answered, " You got all the rights any other student has ever been given."

80.    Also Dr. Fritzhugh Hamrick was asked on page 33 line item 11 "but before my appeal, according to M.U.S.C.'s policies, I have no due process rights?"  He answered, "That is not part of the protocol we have ever followed here."

81.    MUSC admits that the only reason why Plaintiff got dismissed from the University is because of behavior only and not academics and or manual dexterity.

82.    Here Dr. Fritzhugh Hamrick , an assistant dean at M.U.S.C. stated that Plaintiff received all of the due process rights that any other student has ever received when being dismissed from the school and he followed the school's protocol when dismissing him.

83.    From here let us examine those due process rights that Plaintiff and the other students have received when being dismissed from the Medical school.

84.    Plaintiff asked him the following questions with his responses on *Exhibit "C"*:

**On page 36 line item 13,  " Which of those due process rights did I receive?"  He answered, " the appeal."**

**On page 52 line item 4, "Was I given an opportunity to present evidence?  No that was at the appeal.**

**On page 51 line item 8,  "Was I before being dismissed, given a notification in writing of the formal charges." He answered, "no."  There were not time before you were dismissed."**

**On page 49, line item 4, "Was I, before being dismissed given a formal charge" He answered,  "not before you were dismissed."**

**On page 53, line item 5, "Before I was dismissed from M.U.S.C. was I given a chance to make a statement?"  He answered, "no."**

**On page 53,  line item 10, "To present evidence"  He stated "no Not before.  Nothing before, no one else is given time before."**

**On page 56, line item 1, "Before I was dismissed was  I afforded the opportunity to legal or lay counsel?  He answered, " no "**

**On page 20,  line item 17," Before I was dismissed from M.U.S.C. was I given a specific charge?"  He answered, "no"**

**On page 20,  line item 20, "Was I ever given a notification of a hearing before I was dismissed?"  He answered " we do not ever…"**

**On page 21,  line item 11, "Before I was dismissed from M.U.S.C. was I given a notification of a hearing?  He stated,  "there was no hearing."**

**On page 21, line item 18, "Before I was dismissed did I have the opportunity to examine the evidence against me?"  He stated, "no I guess not."**

**On page 21, line item 22, "Did I have the opportunity to cross-examine adverse witnesses?"  He answered, "no."**

**On page 21, line item 25, "Did I have the opportunity to give my testimony?"  He answered, "no.".**

On page 23, line item 15, "Was I formally charged with anything?" He answered, "not until the letter from the Dean."

On page 24, line item 19, Do you admit that the first time I knew anything about the possibility of me getting dismissed is when I received my dismissal letter?" He stated, "Correct."

On page 31 line item 4. Dr Hamrick goes on to say you were not given anything before your received the letter form the dean. We have already established that I thought.

On page 32, line item 2, "Do you admit that before I was dismissed from M.U.S.C. that I did not receive a statement of my rights to bring witnesses, to present evidence, to have representation, and to cross examine witnesses Yes or no?" He responded line item 14," No you did not receive that.

On page 61, line item 16, "Was I dismissed from MUSC for having characteristics which seem inappropriate?' He responded by stating, "correct." "Have you changed your mind once concerning what I was dismissed?" He said, "No I have not changed my mind. that is why you were dismissed I think I said that about ten times in just the last few minutes."

85.    After two semesters, Plaintiff was fraudulently dismissed from MUSC by its Academic Performance Committee despite having a GPA high enough that did not warrant an academic dismissal.

86.    Plaintiff was told via letter from the Dean, that the Academic Committee dismissal was based on "exhibiting personal characteristics which seem inappropriate for one seeking to become a dentist". *See Exhibit "A" and "B".*

87.    Plaintiff was told by the dean that he was dismissed for reporting his peers for cheating and being treated unfairly. *See Exhibit "D".*

88.    Plaintiff was dismissed from MUSC without ever being given a specific or definite charge, violating his Due Process Rights.

89.    Plaintiff was never given notice of a hearing before his dismissal, violating his Due Process Rights.  Plaintiff was never given an opportunity to examine the evidence used in making the determination against him, violating his Due Process Rights.

90.    Plaintiff was never given an opportunity to face his accusers, violating his Due Process Rights. Plaintiff was only made aware of the case against him after it had been decided and was not afforded adequate time to defend against these charges, violating his Due Process Rights.   The case against him was vague having some unknown characteristic which seem inappropriate. Plaintiff, as a student with both liberty and property interests at MUSC, had the right to a Due Process hearing prior to his dismissal, but was never afforded one.

91.    Plaintiff was never given an Honor Code violation for inappropriate behavior nor was he given the University's Due Process hearing prior to dismissal.

92.    Plaintiff was told he was not dismissed for any Honor Code violation, which states that a student accused of misconduct is entitled to written notice and a full hearing not less than seven days prior to the hearing date, a short and plain statement of the charges and supporting facts, the time and place of the hearing, a statement of the rights of the parties to bring witnesses to present evidence, and to have representation.

93.    MUSC states that Plaintiff was not dismissed for misconduct, but for inappropriate behavior. MUSC split hairs to cover up the numerous Due Process violations, as misconduct is defined as inappropriate behavior. In 1994, Plaintiff filed a lawsuit against MUSC for violation of his due process rights and freedom of speech.  Plaintiff also sought injunctive relief.

94.    Judge Carr was presiding over the injunction hearing. **Judge Carr verbally indicated to Plaintiff that MUSC did violate his Due Process rights by dismissing him for non- academic reasons.**  Prior to the Judge Carr's ruling on the injunction matter, an attorney

---

from the Hood Firm ran outside the courtroom and ran back in with Dr. Hamrick the Assistant Dean of the Dental School.

95.    Upon Dr. Hamrick's entering into the courtroom Judge Carr denied Plaintiff's injunctive relief.

96.    Plaintiff conducted a deposition of Dr. Fritzhugh Hamrick, Assistant Dean of the Dental School at MUSC. In that deposition, Hamrick admits that Plaintiff was not dismissed for academic reasons but for exhibiting inappropriate behavior. In that deposition, Hamrick admits that Plaintiff was not formally charged with anything until he received his dismissal letter from the Dean, and that this letter was the first notice of the dismissal proceeding plaintiff received. In that deposition, Hamrick admits that Plaintiff was not informally charged with any offense, including misconduct of any sort, prior to receiving the dismissal letter. In the deposition, of Dr. DeChamplain, he admits that plaintiff was punished for voicing concerns of professor misconduct to MUSC officials. Hamrick also acknowledges the Due Process Procedure for dismissal for students who exhibit behavior which is inappropriate and causes Honor Code Violations. Plaintiff did not receive that Due Process.

97.    Despite the deposition testimony of Dr. Fritzhugh Hamrick stating that Plaintiff was not dismissed for academic or manual dexterity reasons, but for certain utterances, which the school considered as characteristics which seem inappropriate, Plaintiff's claims were dismissed.

98.    The District Court was improperly influenced by the Defendants and fraud upon the court is present as a result of (i) the fraud/misrepresentation that Plaintiff's dismissal from MUSC was for "Academic Reason" all the way up to the Supreme Court, when the evidence and deposition testimony showed the he was not dismissed for academic reasons but for inappropriate

behavior; and (ii) Dr. Hamricks presence in the courtroom during the Injunction Hearing influenced Judge Carr.

## COUNT I: PLAINITFF WAS DENIED HIS DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE US CONSTITUTION AND CIVIL RIGHTS PROTECTED BY 42 U.S.C. § 1983 AGAINST MUSC

99.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within paragraphs 1-98 as if fully recited herein and further state as follows:

100.    The Defendants acted under color of law, and the Defendants deprived Plaintiffs' of one or more of their Constitutional rights.

101.    MUSC deprived Plaintiff of his Due Process rights regarding his dismissal from Dental School.

102.    MUSC was required by the Constitution of the United States and its own Rules to provide Plaintiff with the Honor Code Violation Process for dismissal regarding his alleged inappropriate behavior.

103.    Instead, MUSC circumvented the Constitution and its own rules in dismissing Plaintiff from school. Furthermore, in the school handbook it outlines the due process rights a student must receive before being dismissed.

104.    Further, MUSC, along with the Hood law Firm, an officer of the court, compounded the denial of Plaintiff's rights by committing Fraud Upon the Court.

105.    Defendants, deliberately and with indifference to the rights of Plaintiff, a) set in motion an unconscionable scheme calculated to interfere with the judicial system's ability to impartially adjudicate a matter by improperly influencing the trier and hampering the presentation of Plaintiff's claim b) Plaintiff had a property and liberty interest protected by the Due Process Clause of the U.S. Const. amend. XIV which MUSC violated.

106.    According to the assistant Dean, Dr. FritzHugh Hamrick, under oath admitted Plaintiff was not given any type of due process of law before being dismissed and that he was not dismissed for academics or manual dexterity reasons, but for behavior only.  MUSC states in its own rules and polices that the accused has due process rights, but those rights were not afforded to the plaintiff.  As a matter of law because  the student has liberty and property interests at M.U.S.C. Plaintiff had to be given due process of law before being deprived of those interests and before being dismissed from the medical school.

107.    Thus, M.U.S.C.by their own rules and polices informs students of their rights before getting dismissed, by outlining the fourteenth amendment of the US Constitution but they dismiss students by voting them out of school.  The students are never aware of the upcoming votes nor are they ever invited to attend the vote that will end their professional career.  MUSC is aware of the 14th amendment of the Constitution of the United States but they deliberately with extreme malice deny students of their due process rights by just voting them out of school.

### COUNT II: M.US.C.'S POLICY AND  PROTOCOL IS TO DENY STUDENT'S BASIC DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE US CONSTITUTION AND CIVIL RIGHTS PROTECTED BY 42 U.S.C. § 1983 AGAINST MUSC

108.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within paragraphs 1-107 as if fully recited herein and further state as follows. Dr. Fritzhugh Hamrick has admitted under oath that the plaintiff has received all of the due process rights that any other student has ever been given at M.U.S.C.  He goes on to admit that he followed the school's protocol when dismissing plaintiff from school, which was outlined in exhibit five.  On page 92, line item 11, Dr. Hamrick was asked, "has another student been dismissed that way, just received a letter stating, "You are dismissed."  He answered, "certainly have." *See Exhibit "C"*.

109.    Thus, it is M.U.S.C.'s protocol and standard operating procedure to dismiss students without affording them any type of due process of law. M.U.S.C. has a systemic disregard for any due process rights that they are entitled to for being dismissed for non-academic reasons. M.U.S.C. has dismissed many, many students, hundreds if not thousands, since its inception by intentionally denying them of their constitutional right.  This behavior is done with extreme malice, circumventing the constitution, by just sending students out a dismissal letter, stating they have been dismissed for having characteristics which seem inappropriate.

### COUNT III: MUSC VIOLATED ITS OWN RULES AND POLICIES AS OUTLINED IN THE STUDENT HANDBOOK AND THE HONOR CODE WHEN DISMISSING PLAINTIFF

110.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within paragraphs 1-109 as if fully recited herein and further state as follows. M.U.S.C In its student handbook and the honor code, signed by the plaintiff, outlines the rights of the accused.  Those rights are the same as the ones under the fourteenth amendment of the constitution of the US.  Thus M.U.S.C promised plaintiff due process rights but never gave him any before being dismissed. *See Exhibit "E".*

### COUNT IV: MUSC VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHT TO FREE SPEECH

111.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within paragraphs 1-110 as if fully recited herein and further state as follows. Upon receiving his dismissal, Plaintiff took the deposition of Dr. Dechamplain, who explained to Plaintiff that he dismissed him from the school for certain utterances.   "the fact that you were going around accusing some of our finest professors of treating you incorrectly, cheating of altering grades, of using different curves for certain people, of TAs giving questions to other

students, and all of the accusations you made to me in our conversations to me seemed very inappropriate for a professional man." *See Exhibit "D".*

112.   It is clear that MUSC did not like Plaintiff's private concerns and conversations to the school officials regarding the integrity of the school he attended. However, those utterances to school officials are free speech. Because of those concerns and conversation, MUSC forms a committee to suppress his free speech by voting him out of school. MUSC never informed plaintiff of an upcoming vote. MUSC never invited to plaintiff to attend to be part of vote that would end his professional career, which consisted of five and half years of undergraduate schooling and two semesters of dental school.

113.   MUSC goes on to brag in their deposition, that the first time plaintiff knew of any possibility of him getting dismissed from the school is when he received a dismissal letter stating he had been voted out of school for exhibiting" unclear characteristics which seem inappropriate." In fact the dean did define those characteristics being speech, which is protected by the Constitution of the United States.

114.   From here we will exam fraud upon the court. Fraud on the court occurs when the judicial machinery itself has been tainted, such as when an attorney, who is an officer of the court, is involved in the perpetration of a fraud or makes material misrepresentations to the court. Fraud upon the court makes void the orders and judgments of that court.

115.   In Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985), the court stated "Fraud upon the court is fraud which is directed to the judicial machinery. It is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function --- thus where the impartial functions of the court have been directly

corrupted." As a result of fraud upon the court all orders and judgment are null and void and there are no statues of limitations.

## COUNT V: FRAUD UPON THE COURT

116.     Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within paragraphs 1-115 as if fully recited herein and further state as follows. The factual allegations stated herein along with the exhibits attached hereto demonstrate that MUSC and HOOD set in motion their scheme calculated to interfere with the District Court's and the judicial system's ability impartially to adjudicate Plaintiff's claims by improperly influencing Judge Carr and unfairly hampering Plaintiff's presentation of his claims.

117.     Hood Law Firm, Officers of the Court, engaged in misconduct and then cooperated with each other, with MUSC, to conceal their misconduct from the Court.

118.     Plaintiff provides clear, physical evidence exposing that during legal proceedings before the District Court – Hood Law Firm and MUSC, engaged in misconduct and in a scheme to defraud the Court.

119.     Specifically, Hood Law Firm knowingly submitted to the Court false statements and documentation regarding material evidence; Hood Law Firm knew that their clients, MUSC, were not truthful to the Court, in their statements regarding material evidence; Hood Law Firm submitted to the Court documents that they knew or should and could have known to have been fabricated; Hood Law Firm intentionally allowed to be submitted uncorrected to the Court the statements of Defendants that they knew to be false; and Hood Law Firm cooperated to conceal their misconduct from the Court.

120.     The Defendants position that Plaintiff's dismissal from MUSC was for "Academic Reason" all the way up to the Supreme Court, when the evidence and deposition testimony showed

the he was not dismissed for academic reasons but for inappropriate behavior was material to the Court's knowledge and was relied upon by Judge Carr in his ruling.

121.    The Hood Law firm, an officer of the court and M.U.S.C. go on to write, "Those facts involve one student who has been unable to accept the administratively sound decision to dismiss him from dental school due to his academic deficiencies." (As a side note) The plaintiff attended two semesters at M.U.S.C.; Summer school he passed and the second semester he finished with a GPA of a 2.87 which was much higher than many of his classmates, even after their grades were curved but not his. *See Exhibit "E"*

122.    The Defendants, deliberately and with indifference to the rights of Plaintiff, a) deliberately planned and carefully executed a scheme to defraud Plaintiff, the District Court, Court of Appeals and Supreme Court of the United States.

123.    MUSC fabricated evidence to side step the Academic Policies and Information rules which mandates that Plaintiff receive notice of allegations against him and an opportunity to defend himself/herself against the allegations.

124.    The inappropriate behaviors referred to by MUSC should have been presented in front of the Honor Code Committee, however, they deliberately mislead the Court and Plaintiff. Plaintiff was not notified of the allegations against him, he was not formally charged by MUSC, and his first notice was via the letter attached hereto as *Exhibit "B"* advising him that he has been dismissed from the should.

125.    Had those allegations gone before the Honor Code Committee, Plaintiff would have been entitled to a written notice and a full hearing and a chance to have representation, present evidence, bring witnesses and cross examine witness.

126.    Plaintiff's lawsuit was dismissed by Judge Carr who relied upon fabricated documents, fabricated procedures, attorney misconduct, perjury, and overall conspiracy of Defendants to cover up the due process violations against Plaintiff.

127.    During the proceedings in front of Judge Carr, Defendants mislead the court and hampered Plaintiff's efforts to provide evidence of due process violations in the way he was dismissed from MUSC, as well as evidence that Hood and MUSC fabricated rules and polices not in existence to conceal their fraudulent acts from the District Court during Plaintiff's lawsuit.

128.    Plaintiff claims that the Court's orders and judgement be consider null and void as to his 1994 Complaint.

129.    Defendant's MUSC and Hood Firm improperly influenced the Court and committed fraud upon the court through their misconduct.

130.    Defendants deliberately mislead the Court and Judge Carr and hid evidence showing that Plaintiff was neither dismissed for academic nor manual dexterity reasons, and further presented to the Court and Judge Carr that the only remaining reason for dismissal was for misconduct under the MUSC Honor Code.

131.    Plaintiff will present testimony from Dr. Hamrick substantiating Plaintiffs claims.

132.    Judge Carr verbally indicated to Plaintiff during the injunction that MUSC did violate his Due Process rights by dismissing him for non-academic reasons. He agreed with Plaintiff that he must be given all due process rights before being dismissed.

133.    After that, when it became apparent to the Hood Firm that Judge Carr was going to rule in favor of the Plaintiff during the Injunction Hearing, the attorneys ran to bring in Dr. Hamrick into the courtroom and proceeded to mislead the court and commit fraud upon the court.

134.    Dr. Hamrick is a person of considerable influence and stature in Charleston, South Carolina.

135.    Upon Hood's interruption of the hearing and Dr. Hamrick's involvement, Judge Carr proceeded to deny the injunction, and when asked for a reason for the sudden drastic change of view, Judge Carr replied "I don't know".  Upon his ruling, Judge Carr rapidly darted out of the courtroom.

136.    Plaintiff is accorded all of the many rights, freedoms, and benefits under the United States Constitution and the Constitution of the State of South Carolina.  The Defendants acted under color of law, and the Defendants deprived Plaintiff of one or more of his Constitutional rights.

137.    The Defendants, deliberately and with indifference to the rights of Plaintiff, a) engaged in a tactic which would improperly influence the court, b) used a tactic to gain an unfair advantage over Plaintiff, c) perverted the justice system by improperly influencing the court.

## COUNT VII: FRAUD UPON THE COURT VIA FRAUDULENT EVIDENCE

138.    Plaintiff hereby reaffirms, reiterates, and incorporates by reference each and every allegation contained within paragraphs 1-137 as if fully recited herein and further states as follows.

139.    In Plaintiff's case, Judge Carr failed to address the fraudulent actions of MUSC and Hood Law Firm. Courts have a duty to and may act sua sponte to expunge fraudulently obtained judgments. Supportive decisions include: *Universal Oil Prods. Co. v. Root Ref. Co.*, 66 S. Ct. 1176, 90 L. Ed. 1447, 90 L. Ed. 1447 (1946); *Martina Theatre Corp. v. Schine Chain Theatres, Inc.*, 278 F.2d 798 (2d Cir. 1960)-which held that a "Defrauded district court may take action sua sponte to expunge a judgment constituting fraud on the court and anyone, whether his hands are clean or dirty, may suggest that it do so."; and *Root Ref. Co. v. Universal Oil Prods. Co.*, 169 F.2d 514,

521-23 (3d Cir. 1948) (CCA. 3d Cir. 1948)-where the evidence raised to it "not only justify the inquiry but impose upon us the duty to make it, even if no party to the original cause should be willing to cooperate, to the end that the records of the court might be purged of fraud, if any should be found to exist."

140.    The Defendants acted under color of law, but deprived Plaintiff of his constitutional rights.

## COUNT IX: FRAUD UPON THE COURT: EXTRINSIC AND INTRINSIC EVIDENCE

141.    Plaintiff hereby reaffirms, reiterates, and incorporates by reference each and every allegation contained within paragraphs 1-140 as if fully recited herein and further states as follows.

142.    The Defendants acted under color of law, and the Defendants deprived Plaintiff of one or more of his Constitutional rights. MUSC misrepresented the reason for Plaintiff's dismissal from Dental School.

143.    MUSC created and caused the Court to rely on documents and testimony that misrepresented Plaintiff's dismissal for academic reasons. MUSC knew that Plaintiff's dismissal from Dental School was not for Academic Reasons as the deposition testimony of Dechamplain and Dr. Hamrick stated that the reason is for inappropriate behavior. Dr. Hamrick stated "you were dismissed for inappropriate behavior. I guess you could consider that as some character problems." These documents were instrumental in persuading Judge Carr in favor of MUSC.

144.    MUSC and Hood Law Firm then perpetrated this scheme all the way to the Supreme Court by stating that Plaintiff was dismissed for academic reasons.  The Defendants, deliberately and with indifference to the rights of Plaintiff, a) deliberately planned and carefully executed a

scheme to defraud Plaintiff, the District Court, Court of Appeals and Supreme Court of the United States.

**COUNT X: THE SCHOOL OFFICIALS CONSPIRED TO COMMIT FRAUD AGAINST THE PLAINTIFF TO PERMANENTLY END HIS DENTAL CAREER BY FORMING A COMMITTEE AND DISMISSING HIM FROM THE DENTAL SCHOOL FOR ACADEMIC REASONS AND FOR MANUAL DEXTERITY BUT THE REAL REASON WAS HE COMPLAINED ABOUT CHEATING AND UNFAIR TREATMENT.**

145.    Plaintiff hereby reaffirms, reiterates, and incorporates by reference each and every allegation contained within paragraphs 1-144 as if fully recited herein and further states as follows.

146.    On Dec. 21st 1993 Plaintiff went to the president's office to talk to him about unfair treatment. The secretary refused telling him he must follow the chain of command. On the same day Plaintiff talked to the dean about his issues at hand. Then on the same day Dr. Hamrick formed a committee and vetoed him out of school, which was also the same day the dean signed his letter of dismissal.

147.    The plaintiff passed his first semester which consisted of only course- gross anatomy. The plaintiff passed his second semester fishing with a 2.87 grade average, which is clearly passing but would have finished both semesters with a much better grade if he had received the curves that his other class mates had gotten.

148.    Yet the school officials intentionally circumventing the constitution of the United States voted him out of school claiming it was for academics and for manual dexterity reasons, but they know that it was not, but it was because he complained about unfair treatment and cheating. The attached exhibits show Dr. Fritzhugh Hamrick admits that Plaintiff did not get dismissed for academics or for manual dexterity reasons.

149.    See also the following testimony in Exhibit "C": page 27 line item 18, "Did I after finishing the semester with a gap of a 2.87 get kicked out of school because a teacher gave me a

F: yes or no. He states, "No." You were dismissed because of the behavior. Page 59 line number, 24, "Now I have a question, is manual dexterity considered academic performance or is that something else?" He responded, " it is all of the academics."

## COUNT XI: THE ACTS/OMISSIONS OF DEFENDANTS AND THEIR AGENTS AMOUNT TO UNCONSCIONABLE ACTS AGAINST PUBLIC AND SCHOOL POLICY

150.    The school officials unconscionably and against public and school policy dismissed the Plaintiff from school for non-academic reasons on December 21st, 1993 when he tried to talk to the school's president about unfair treatment but ended up talking to the dean and getting voted out of school on the same day.

151.    When Plaintiff complained to assistant Dean Dr. Fritzhhugh Hamrick about being treated unfairly, cheating, and different curves being used, he threatened plaintiff stating for him to keep his mouth shut if not he would be given F's in subjective grading class- against public policy and school policy.

152.    Plaintiff obeyed his threat but at the end of the second semester, the Plaintiff's only subjective class the teacher was going to give him a F. Thus he threatened student and carried it out.

153.    Dr. Whittaker under other in his deposition was asked did he curve the grades of his classmates without curving plaintiff's grade. Dr. Whittaker stated no. **Plaintiff's** grades revealed that he curved the grades of the entire class, but not his. Plaintiff had an A average in his non subjective class portion but on the subjective portion Dr Whittaker Flunked him, giving him an F for the entire class. If Plaintiff had received the same curve as his class-mates he would have easily and with a good grade passed his class.

154.    There were certain students who finished gross anatomy with a much lower grade than Plaintiff's. The teacher curved the grades of these students and gave them a grade close to the Plaintiff's and or better than his. This was the initial complaint from the Plaintiff of the school. The school denied it. The school refused to turn over the gross anatomy grades and concealed this evidence from the Court.

## DAMAGES

155.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within paragraphs 1-154 as if fully recited herein and further state as follows: As a direct and proximate result of the acts and omissions outlined above, Plaintiff has been severely damaged. Defendant MUSC and Hood Firm conduct caused emotional distress and mental anguish and trauma. Plaintiff seeks compensatory damages in an amount deemed sufficient by the trier of fact to compensate them for their damages, which include loss of income earning capacity, mental anguish, pain, and suffering. MUSC is liable to Plaintiff for damages of loss of earning capacity had Plaintiff being able to complete Dental School and become a Dentist. Plaintiff also seek exemplary damages against Defendants MUSC and Hood Firm.

156.    As a direct and proximate result of the acts and omissions outlines above, Plaintiff seeks damages in the amount of the lost wages Plaintiff would have accrued as a graduate of MUSC.

## JURY DEMAND

157.    Plaintiffs respectfully request trial by jury.

## CONCLUSION & PRAYER FOR RELIEF

158.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within paragraphs 1-157 as if fully recited herein and further state as follows.

The Court is not limited in its power to grant relief. The power to vacate a judgment that has been obtained by fraud is a power inherent in the courts (Wright and Miller, section 2870, p.572 (2012)]. Supportive decisions include: *Universal Oil Prods. Co. v. Root Ref. Co.*, 328 U.S. 575, 580, 66 S. Ct. 1176, 1179, 90 L. Ed. 1447 (1946).; and Greater Boston Television "*Greater Bos. Television Corp. v. FCC*, 463 F.2d 268, 278 (D.C. Cir. 1971)—which held that "The spirit of the 'fraud on the court' rule is applicable whenever the integrity of the judicial process or functioning has been undercut—certainly in any instance, of misconduct by a party."; and the decision in Chicago Title & Trust Co. v. Fox Theatres Corp., 182 F. Supp.18, 38 (S.D. N.Y. 1960), which held that "A court has the inherent power to inquire into the integrity of its own judgments and to set them aside when fraud or corruption of its officers has been shown."

159.    Fraud on the court is a reason for non-adherence to the doctrine of "res judicata", as well as to the traditional legal values favoring "settled judgments" and an "end to litigation". Supportive decisions include: *Kenner v. Commissioner*, 387 F.2d 689, 691 (7th Cir. 1968)—which held that "a decision produced by fraud on the court is not in essence a decision at all and never becomes final." ; and the Supreme Court Decision in Hazel-Atlas 322 .*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 64 S. Ct. 997 (1944), Ed. L 1250 (1944), which held that:

> "Every element of the fraud here disclosed demands the exercise of the historic power of equity, to set aside fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hartford's sworn, admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals."

(*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944).)

"Furthermore, tampering with the administration, of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institu¬tions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."

(*Id.* at 246, 64 S. Ct. at 1001, 88 L. Ed. 1250)

160.    Rule 60(d) (3) does not limit the Court's power to set aside a judgment for fraud on the court. This power is: 1**)** not limited by the timing of the actions under consideration—as upheld in *Serzysko v. Chase Manhattan Bank*, 461*F.2d 699 (2d Cir. 1972); *Wilkin v. Sunbeam Corp.*, 405 F.2d 165 (10th Cir. 1968); *Dausuel v. Dausuel*, 195 F.2d 774 (D.C. Cir. 1952); and *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 640 (N.D. Cal. 1978), citing Wright & Miller, judgment affd, *Valerio v. Boise Cascade Corp.*, 645 F.2d 699 (9th Cir. 1981).     Moreover,    Lockwood    v. Bowles, *Lockwood v. Bowles*, 46 F.R.D. 625 (D.D.C. 1969),        634 (D.        D.C.        1969) held that: "The only instance in which Rule 60(b allows for the reopening of lawsuits regardless of the passage of time is when there is an allegation of fraud upon the court, for the law favors discovery and correction of corruption of the judicial process even more than it requires an end to lawsuits."; **2)** not barred by laches (*Hazel-Atlas Glass Co.*, 322 U.S. at 246, 64 S. Ct. at 1001, 88 L. Ed. 1250), 3) survives considerations of whether a party "exercised proper diligence" (*id.* at

246, 64, 64 S. Ct. 997, 88 L. Ed. 1250 S. Ct. at,1001), and 4) survives instances where a party lacks "clean hands" (*Martina Theatre Corp.*, 278 F.2d at 801.

161.    In Plaintiff's case, Judge Carr failed to address the fraudulent actions of MUSC and Hood Law Firm. Courts have a duty to and may act sua sponte to expunge fraudulently obtained judgments. Supportive decisions include: *Universal Oil Prods. Co.*, 66 S. Ct. 1176, 90 L. Ed. 1447, 90 L. Ed. 1447; *Martina Theatre Corp.*, 278 F.2d 798-which held that a "Defrauded district court may take action sua sponte to expunge a judgment constituting fraud on the court and anyone, whether his hands are clean or dirty, may suggest that it do so."; and *Root Refining Co. v. Universal Oil Products Co.*, 169 F.2d 514, 521-523 (CCA. 3d Cir. 1948)-where the evidence raised to it "not only justify the inquiry but impose upon us the duty to make it, even if no party to the original cause should be willing to cooperate, to the end that the records of the court might be purged of fraud, if any should be found to exist."

**WHEREFORE**, Plaintiff will respectfully request that Defendants be cited to appear and answer, and that on final trial, Plaintiffs be awarded judgment against Defendants for the following:

a. Nullification of the Court's Previous ruling against Wayne Traywick;

b. Grant a new trial to address Plaintiff's Claims;

c. A judgment against all Defendants on each cause of action as well as a fair and reasonable amount of compensatory damages;

d. A monetary damage for violation of Plaintiffs' Constitutional Rights, including, but not limited to: physical pain and mental anguish suffered at the hands of Defendants;

e.  A monetary damage for violation of Plaintiffs' Wrongful Death Statute and Survival Action;

f.  An award of Punitive damages;

g.  Pre- and post-judgment interest at the maximum allowable rate;

h.  Court costs and expenses of this action;

i.  The right for the plaintiff to have his property and liberty given back to him, and

j.  Any and all other relief or damages applicable to the facts of this matter or that the Court deems fitting and proper.

Respectfully Submitted,
By   /s/Wayne Traywick_____
Wayne Traywick
520 E. Vine Street.  #80048
Keller, Texas
Pro Se